# Court of Appeals
## Tenth Appellate District of Texas

---

### 10-23-00346-CV

---

Roger Landry, Kenneth Porter and Q.A. Services, L.L.C.,
Appellants

v.

Philip Currie and Charlotte Currie,
Appellees

---

On appeal from the
77th District Court of Limestone County, Texas
Judge Pat Simmons, presiding
Trial Court Cause No. 31883-A

---

CHIEF JUSTICE JOHNSON delivered the opinion of the Court.

## MEMORANDUM OPINION

After being injured in a motor vehicle accident, Philip and Charlotte Currie filed suit against Roger Landry, Kenneth Porter, and Q.A. Services, L.L.C. The Curries alleged negligence and gross negligence claims against Landry, a negligent entrustment claim against Porter, and claims of respondeat superior and negligent supervision, training, and retention, against Q.A. The jury found that Landry was acting in the scope of his

employment with Q.A. and that the negligence of Landry, Porter, and Q.A. proximately caused the occurrence in question. The jury apportioned responsibility as 30% for Landry, 20% for Porter, and 50% for Q.A. The jury awarded Charlotte $34,888,255.00 in damages, Philip $5,746,547.00 in damages, and $806,400.00 in punitive damages against Landry to be shared equally by Charlotte and Philip. The trial court entered judgment on the jury verdict.

After entering judgment, the trial court signed a suggestion of remittitur reducing Charlotte's damage award to $9,299,555.00 and Philip's damage award to $5,242,285.00. Charlotte and Philip accepted the remittitur. This appeal followed.[1]

## Issues on Appeal

Porter and Q.A. together raise six issues on appeal: (1) the evidence is legally and factually insufficient to support the jury's negligent entrustment finding against Porter, (2) the Curries sought and obtained submission of an improper negligence theory against Q.A., (3) the evidence is legally and factually insufficient to support the jury's finding that Landry was acting in the scope of his employment with Q.A., (4) the evidence is legally and factually insufficient to support the jury's negligence finding against Q.A., (5) the entire

---

[1] Philip and Charlotte filed Notice of Cross-Appeal on November 15, 2023, and on December 1, 2023, they filed an Unopposed Motion to Voluntarily Dismiss Cross-Appeal. That motion is granted.

judgment should be reversed and remanded for a new trial in the event this Court sustains Issues 2, 3, and/or 4, and (6) the evidence is legally and factually insufficient to support the damages awarded to the Curries.

Landry argues on appeal that (1) the evidence is legally and factually insufficient to support the noneconomic damages awarded to Charlotte and Philip, and (2) because the evidence is insufficient to support the noneconomic damages, the jury's exemplary damages award should be reversed. We modify the judgment and affirm as modified.

## Background

Porter is a co-owner of Q.A, a company that builds cellular phone towers at various locations. Porter owned several trucks that were driven to the jobsites by Q.A. employees, and the "company yard" was located at his residence. Landry, a former employee of Q.A., traveled to the jobsites where he helped build the cellular phone towers. Landry was authorized to drive Porter's vehicles for Q.A., and in December 2019, he drove to a jobsite near Canadian, Texas.

While at the jobsite, Landry became ill and went to a local hospital. After not being able to work for two days, Landry contacted Porter and asked if he could return home because he was unable to perform his job requirements. Porter sent another employee to the jobsite and allowed Landry to return home. Landry left the jobsite in Porter's vehicle, and he planned to return the

vehicle to the company yard where his girlfriend would meet him and take him home.

Landry admitted that he had smoked marijuana the night before he drove home and that he had consumed alcohol on the drive home. At an intersection in Limestone County, Landry ran through a stop sign and collided with the Currie's pickup. After the accident, Landry gave a blood sample that revealed a blood alcohol content of 0.114 and also detected marijuana. Landry was convicted of intoxication assault and sentenced to seven years confinement.

The Currie's had extensive injuries from the collision. Charlotte suffered an aortic rupture that was life threatening as well as a significant abdominal injury that caused severe damage to her large and small intestines. Charlotte also had rib fractures and contusions to both of her kidneys. Charlotte remained in a medically induced coma for approximately one month. After being released from the hospital and a rehabilitation center, Charlotte went to live with her daughter because she could not care for herself. Charlotte continued to live with her daughter at the time of trial.

Philip suffered a severe fracture of his arm that caused a blood clot to form in the major artery supplying blood to the arm. Because of his trauma and injuries, Philip had a stroke that resulted in a loss of his peripheral vision. Philip also had rib fractures and a severe laceration to his tongue. After being

released from the hospital, Philip went to live with his sister because he could not care for himself. He eventually moved back to his home, and his brother moved in to help care for him.

## Porter and Q.A.'s Issue One

Porter and Q.A. argue in the first issue that the evidence is legally and factually insufficient to support the jury's negligent entrustment finding against Porter.

### Standards of Review and Applicable Law

### Legal Sufficiency

When a party challenges the legal sufficiency of an adverse finding on an issue on which they did not have the burden of proof, the party must demonstrate on appeal that no evidence supports the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Evidence is viewed in the light most favorable to the verdict. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *See Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

### Factual Sufficiency

In a factual-sufficiency review, we consider all of the evidence in the record in a neutral light and set aside the jury's verdict only if it is so contrary

to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *see Republic Petroleum v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 433 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Jurors are entitled to resolve inconsistencies in witness testimony, whether those inconsistencies result from the contradictory accounts of multiple witnesses or from internal contradictions in the testimony of a single witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *see Republic Petroleum*, 474 S.W.3d at 433.

**Negligent Entrustment**

The elements of negligent entrustment are: (1) entrustment of a vehicle by the owner; (2) to an unlicensed, incompetent, or reckless driver; (3) that the owner knew or should have known to be unlicensed, incompetent, or reckless; (4) who was negligent on the occasion in question; (5) and whose negligence proximately caused the accident. *Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987) (internal citations omitted). For entrustment to be a proximate cause, the defendant entrustor should be shown to be reasonably able to anticipate that an injury would result as a natural and probable consequence of the entrustment. *Schneider*, 744 S.W.2d at 596.

**Discussion**

When Landry was hired in December 2018, Q.A. checked his driving record, and it was "clean." Porter stated that as of June 2019, Landry did not

have any driving convictions and was cleared by the insurance company to drive his vehicles.

In July 2019, Landry was arrested for public intoxication and resisting arrest. He was not working for Q.A. on the day of his arrest, and he was not at a jobsite. The record shows that Porter was aware of that arrest. On September 19, 2019, Landry was arrested for driving while intoxicated. Again, Landry was not working at the time and was not at a jobsite. Landry was convicted of driving while intoxicated, but his driver's license was not suspended. The record shows that Porter was aware of Landry's arrest and instructed him not to drink alcohol in any of his trucks or take any of his trucks to a bar. There is no evidence that Landry had any prior accidents or driving infractions while operating Porter's vehicles.

There is no dispute that Porter entrusted his vehicle to Landry, that Landry was negligent on the occasion in question, and that Landry's negligence was the proximate cause of the accident. The parties dispute whether Landry was a reckless driver and whether Porter knew or should have known that Landry was a reckless driver.

Porter cites *Allways Auto Group, Ltd., v. Walters* in support of his argument that the evidence does not support the jury's finding on negligent entrustment. 530 S.W.3d 147 (Tex. 2017) (per curiam). In *Allways,* an auto dealer, Allways Auto Group, provided a loaner vehicle to Heyden, who had

prior arrests for driving while intoxicated and did not have a valid driver's license at the time of the entrustment. *Id*. at 148. Heyden admitted that he was intoxicated at the time of the entrustment, but the salesperson did not observe any obvious signs of intoxication. *Id*. Eighteen days after Allways provided the vehicle to Heyden, he had an accident in the loaner vehicle that injured another person. *Id*. at 147. Heyden was intoxicated at the time of the accident and was convicted of intoxication assault and driving while intoxicated. *Id*. at 148.

The Court held that Allways established that its providing Heyden a loaner car was not a proximate cause of his injuring the other party eighteen days later. *Id*. at 149. The Court stated, "[f]or entrustment to be a proximate cause, the defendant entrustor should be shown to be reasonably able to anticipate that an injury would result as a natural and probable consequence of the entrustment." *Id*. at 148 (citing *Schneider,* 744 S.W.2d at 596). The Court noted that if Heyden were visibly intoxicated when he got the loaner vehicle, Allways could reasonably have anticipated he might have a wreck before he sobered up, but that Allways could not have foreseen that Heyden would get drunk eighteen days later and have an accident. *Id*. at 148-49.

Unlike *Allways*, there is evidence to support a finding that Landry was a reckless driver and that Porter knew or should have known that Landry was a reckless driver. *See Schneider,* 744 S.W.2d at 596. Recklessness is defined

as an act that the operator knew or should have known posed a high degree of risk of serious injury. *See 4Front Engineered Solutions, Inc., v. Rosales*, 505 S.W.3d 905, 911 (Tex. 2016) (citing *City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex. 1998)). There is no dispute that Landry was driving while intoxicated at the time of the collision with the Curries. Landry arrest for driving while intoxicated was approximately three months before the collision with the Curries. After his arrest, Landry was instructed by Porter not to drink in any of Porter's vehicles, but he ignored that instruction. Evidence of a driver's prior arrest for driving while intoxicated support a jury's finding that a driver was reckless. *See Atlantic Indus., Inc. v. Blair*, 457 S.W.3d 511, 518 (Tex. App.—El Paso 2014), *reversed on other grounds*, 482 S.W.3d 57 (Tex. 2016) (per curiam).

There was evidence that Porter knew or should have known that Landry was a reckless driver. Unlike other negligent entrustment cases where the reckless driving record was discoverable through background checks, Porter was personally aware of Landry's reckless behavior. Six months prior to the collision with the Curries, when Landry was arrested for public intoxication, Porter bailed him out of jail. Porter acknowledged that he bailed Landry out of jail because Landry "had the keys to my truck in his pocket." Three months prior to the collision with the Curries, Landry was arrested for driving while intoxicated before going to a remote job site. Porter again got Landry out of

jail after that arrest. According to Porter, when he went to pick him up from jail, Landry was "still too drunk to be released so they held him another day."

Porter admitted that at the time he entrusted his vehicle to Landry, he knew that Landry was an alcoholic. He also admitted that he knew Landry had a propensity to get drunk at remote job sites as well as other places. Viewing all of the evidence in the light most favorable to the verdict, we conclude that there was more than a scintilla of evidence to support the finding on negligent entrustment. *See Pesina v. Hudson*, 132 S.W.3d 133, 139 (Tex. App.—Amarillo 2004, no pet.). In addition, viewing all of the evidence in a neutral light, the finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule Porter and Q.A.'s first issue.

## Porter and Q.A.'s Issues Two, Three, and Four

In the second issue, Porter and Q.A. argue that the trial court submitted an improper negligence theory to the jury. In the third issue, they contend that the evidence is legally and factually insufficient to support the jury's finding that Landry was acting in the scope of his employment with Q.A. In the fourth issue, they argue that the evidence is legally and factually insufficient to support the negligence findings against Q.A.

### Standard of Review and Applicable Law

A trial court must submit jury questions, instructions, and definitions that "are raised by the written pleadings and the evidence." Tex. R. Civ. P. 278; *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 469 (Tex. 2017). In reviewing alleged error in a jury submission, we consider "the pleadings of the parties and the nature of the case, the evidence presented at trial, and the charge in its entirety." *United Scaffolding*, 537 S.W.3d at 469 (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009)). The alleged charge error "will be deemed reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment." *United Scaffolding*, 537 S.W.3d at 469 (quoting *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551. 555 (Tex. 1986)).

**Negligent Hiring, Supervision, or Retention**

To successfully prosecute a claim of negligent hiring, supervision, or retention, a plaintiff is required to show that (1) the employer owed a legal duty to protect third parties from the employee's actions, and (2) the third party sustained damages proximately caused by the employer's breach of that legal duty. *Rosell v. Central West Motor Stages, Inc.*, 89 S.W.3d 643, 655 (Tex. App.—Dallas 2002, pet. den'd); s*ee also Houser v. Smith,* 968 S.W.2d 542, 544 (Tex. App.—Austin 1998, no pet.).

**Respondeat Superior**

Under the doctrine of respondeat superior, an employer is responsible for the negligence of an employee acting within the course and scope of his employment, even though the employer has not personally committed a wrong. *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998). To prove an employer's vicarious liability for a worker's negligence, the plaintiff must show that, at the time of the negligent conduct, the worker (1) was an employee and (2) was acting in the course and scope of his employment. *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018).

To prove that an employee acted within the course and scope of employment, a plaintiff must show that the act was (1) within the general authority given to the employee, (2) in furtherance of the employer's business, and (3) for the accomplishment of the object for which the employee was employed. *Mejia-Rosa v. John Moore Servs., Inc.*, No. 01-17-00955-CV, 2019 WL 3330972, at *6 (Tex. App.—Houston [1st Dist.] July 25, 2019, no pet.) (mem. op); *Green v. Ransor, Inc.*, 175 S.W.3d 513, 516 (Tex. App.—Fort Worth 2005, no pet.).

**Discussion**

In their pleadings, the Curries alleged claims of respondeat superior and negligence, including negligent supervision, training, and retention, against Q.A. In the charge, Question 1 asked whether Landry was acting within the

scope of his employment with Q.A. The jury answered "yes." Question 2 asked whether the negligence, if any of Landry, Porter, and Q.A. proximately caused the occurrence in question. The jury responded yes as to each of the named parties. The charge included the definition of negligent entrustment in relation to the negligence claim against Porter. The charge did not contain any definitions or instructions as to negligent supervision, training, and retention as to Q.A.

The record shows that the Curries proposed jury charge requested an instruction that:

> An employer has a general duty to adequately hire, train, and supervise its employees. An employer owes a duty to its other employees and to the general public to ascertain the qualifications and competence of the employees it hires, especially when the employees are engaged in occupations that require skill or experience that could be hazardous to the safety of others.

The trial court did not give the requested instruction.

Q.A. contends that the trial court's instruction on negligence was improper as to Q.A. because it only included a general negligence theory rather than negligent supervision, training, and retention. Q.A. cites *United Scaffolding v. Levine* as authority. 537 S.W. at 469.

In *United Scaffolding*, Levine, a pipefitter for Valero Energy Corporation, brought suit against United Scaffolding, a contractor, after he was injured on scaffolding constructed by United Scaffolding. *Id.* at 467.

Levine alleged that United Scaffolding improperly constructed the scaffold and failed to remedy or warn of the dangerous condition on the scaffold, causing his injury. *Id.* at 468. The trial court submitted a general negligence question to the jury, and the jury found United Scaffolding negligent. In its motion for new trial and a motion for judgment notwithstanding the verdict, United Scaffolding asserted for the first time that the trial court improperly submitted a general negligence question to the jury when Levine's claim sounded in premises liability, and the trial court denied the motions. *Id.*

United Scaffolding argued on appeal that Levine's claim was improperly submitted as a general negligence theory. *Id.* The Court stated that negligence and premises liability claims are separate and distinct theories of recovery, requiring plaintiffs to prove different, albeit similar, elements to secure judgment in their favor. *Id.* at 471. The Court explained that generally, a plaintiff need only submit a general negligence question in support of a claim for a defendant's liability pursuant to a negligent activity theory. *Id.* However, in a premises liability claim, the plaintiff must prove additional elements. *See id.* Therefore, the Court concluded that when submitting a premises liability cause of action to a jury, a general negligence question, unaccompanied by the additional elements as instructions or definitions, cannot support a recovery for premises liability. *Id.* at 472. The Court determined that based upon the source of Levine's injury, his pleadings, and the evidence presented at trial,

Levine's case sounded in premises liability. *Id*. at 479. The theory of recovery submitted to the jury did not reflect the claim that was raised by the pleading and the evidence. *Id*. at 480.

The Court held that because the case was submitted to the jury under only a general negligence theory, without the elements of premises liability as instructions or definitions, the verdict could not support a recovery for premises defect. *Id*. at 480-81. The Court further held that Levine waived his premises liability claim because he did not obtain findings on the premises liability elements. *Id*. at 481.

Q.A. maintains that because the Curries did not obtain a jury submission on their negligent supervision, training, and retention theories, the verdict was rendered on a theory upon which relief cannot be granted against Q.A. The Curries respond that *United Scaffolding* is not applicable because unlike negligence and premises liability claims, which are distinct and separate theories of recovery, negligence and negligent supervision, training, and retention are not separate theories of recovery. However, where only ordinary negligence is alleged, case law supports the contention that negligent hiring or negligent entrustment and respondeat superior are mutually exclusive modes of recovery. *Rosell,* 89 S.W.3d at 654; *Estate of Arrington v. Fields,* 578 S.W.2d 173, 178 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.).

In *Rossell*, a bus driver for Central West Motor Stages struck and killed Rossel, who was assisting another injured motorist. *Id.* at 649. Rossell's estate brought suit against the injured motorist, the bus driver, and Central West Motor Stages. *Id.* The first question to the jury asked if the negligence of the bus driver, the injured motorist, or Rossell proximately caused the occurrence. *Id.* at 653. Rossell's estate complained that Central West should have been included in the first question. Central West stipulated that the bus driver was acting within the scope of his employment. *Id.* at 654. The trial court submitted a separate question on Central West's liability for negligent entrustment, hiring, supervision, and retention. *Id.* at 655-56. Rossell's estate complained on appeal that Central West should have been included in the first general negligence question as well. *Id.* at 653.

The court noted that Rossell's estate proposed several theories under which Central West was liable including negligent entrustment and negligent supervision, training, and retention. *Id.* at 655. The court stated that while the theories were similar, they had different requirements. *Id.* The court explained that to successfully prosecute a claim of negligent hiring, supervision, or retention, a plaintiff is required to show that (1) the employer owed a legal duty to protect third parties from the employee's actions, and (2) the third party sustained damages proximately caused by the employer's breach of that legal duty. *Id.*

The court reasoned that there was no need to include Central West in the general negligence liability question because there was a separate question on Central West's negligence. *Id.* at 656. The court determined that the trial court did not abuse its discretion in submitting a separate liability issue for Central West. *Id.*

We find the reasoning in *Rossell* to be instructive. The Curries' pleadings alleged claims for negligent hiring, supervision, or retention, and they submitted evidence at trial in support of those claims. Unlike the charge before us, in *Rossell*, the trial court submitted a separate question on the employer's liability. The court determined that negligent hiring, supervision, or retention are mutually exclusive modes of recovery than that of general negligence with different proof requirements. *Id.* at 654-55. The court found that the trial court correctly submitted a separate question on the employer's liability. *Id.* at 656. We agree that general negligence and negligent hiring, supervision, or retention are mutually exclusive modes of recovery than that of general negligence with different proof requirements. *See Id.* at 654-55.

The Currie's pleadings and the evidence at trial alleged a claim for negligent hiring, supervision, or retention. Because negligent hiring, supervision, or retention requires additional proof requirements than general negligence, a general negligence question, unaccompanied by the additional elements as instructions or definitions, cannot support a recovery for negligent

hiring, supervision, or retention. *See United Scaffolding*, 537 S.W.463 at 472. Therefore, we agree that the trial court erred by submitting a general negligence theory against Q.A. without the additional proof requirements of negligent hiring, supervision, or retention as instructions or definitions. *See Id.* at 480-81.

The Curries contend that Q.A. did not object to the charge, and, therefore, did not preserve the argument for review. A defendant has no obligation to complain about a plaintiff's omission of an independent theory of recovery; rather, the burden to secure proper findings to support that theory of recovery is on the plaintiff, and a plaintiff who fails to satisfy that burden waives that claim. TEX. R. CIV. P. 279; *United Scaffolding*, 537 S.W.463 at 481. Therefore, Q.A. was not required to object to the omission of the instruction on negligent hiring, supervision, or retention. *See United Scaffolding*, 537 S.W.463 at 481. We sustain Porter and Q.A.'s second issue. Because we hold that the trial court improperly submitted a general negligence question, we need not address Porter and Q.A.'s fourth issue arguing that the evidence was legally and factually insufficient to support the jury's finding on Q.A.'s negligence. *See* Tex. R. App. P. 47.1.

In *United Scaffolding*, the plaintiff did not have another basis of recovery, and the Court rendered a take-nothing judgment in United Scaffolding's favor. *Id.* at 481, 483. While the Curries cannot recover on their

claims of negligent hiring, supervision, or retention, unlike *United Scaffolding*, they have a remaining basis of recovery on their claim of respondeat superior.

In the third issue, Porter and Q.A. argue that the evidence is legally and factually insufficient to support the jury's finding that Landry was acting within the scope of his employment with Q.A. To prove that an employee acted within the course and scope of employment, the Curries must show that Landry was acting (1) within the general authority given to him, (2) in furtherance of Q.A.'s business, and (3) for the accomplishment of the object for which Landry was employed. *See Means v. Property Management Contractors, LLC*, No. 01-21-00415-CV, 2023 WL 138620 at *5 (Tex. App.—Houston [1st Dist.] Jan. 10, 2023, no pet.) (mem. op).

Because Landry was authorized to drive Porter's trucks for Q.A., he was acting within the general authority given to him. The question before us is whether Landry was acting in furtherance of Q.A.'s business for the accomplishment of the object for which he was employed. *See id.*

Porter owned the trucks used by Q.A. employees for Q.A.'s business. The record shows that Q.A. employees, including Landry, would drive the trucks from the company yard at Porter's residence to the jobsites and return the trucks to the company yard. Porter agreed that once a truck left the company yard to go to a jobsite, that truck was being used for Q.A. business. He further

agreed that employees expected to be paid for their time driving the trucks to jobsites.

Landry testified that driving to and from job sites was part of his job requirement and that he was compensated for driving to and from the jobsites. Landry became ill at the jobsite and wanted to return home. According to Landry, he was informed that in order to return home, he would have to drive one of Porter's trucks back to the yard. If Landry did not drive one of Porter's trucks back, a truck would be left at the remote jobsite because there would be more trucks than drivers. Landry did not live near the company yard. He intended to return Porter's truck to the company yard as instructed, and have his girlfriend pick him up there so that he could return home. Landry believed he would be paid for driving the truck from the jobsite to the company yard.

Landry was acting in furtherance of Q.A.'s business for the accomplishment of his work for Q.A. at the time of the collision. Landry was returning the truck to the company yard so that it would not be left at the jobsite. Porter agreed that when a truck left the company yard, it was for Q.A. business. There is nothing in the record to show that Landry was ever allowed to drive one of Porter's trucks to his home. The trucks left from the company yard to go to the jobsites and were returned to the company yard. Even though Landry was leaving the jobsite because he was ill, he was still required to return the truck to the company yard. He was not authorized to take the truck

to his house, which was many miles away. Therefore, the "coming and going" rule is not applicable. *See Orozco v. County of El Paso*, 602 S.W.3d 389, 396 (Tex. 2020). Moreover, because Porter paid for the transportation and controlled its use, the "coming and going" rule would not exclude Landry's return trip to the company yard from the course and scope of his employment. *See id.* Viewing all of the evidence in the light most favorable to the verdict, we conclude that there was more than a scintilla of evidence to support the finding that Landry was acting in the course and scope of his employment. In addition, viewing all of the evidence in a neutral light, the finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Accordingly, we overrule Porter and Q.A.'s third issue.

In summary, the evidence is legally and factually sufficient to support the jury's findings against Porter for negligent entrustment. The Curries cannot recover on their negligence claims against Q.A. because trial court erroneously submitted a general negligence theory against Q.A. without the additional proof requirements of negligent hiring, supervision, or retention as instructions or definitions. However, the evidence is legally and factually sufficient to support the jury's finding that Landry was acting in the course and scope of his employment, and that supports the trial court's judgment against Q.A. *See Boatland of Houston, Inc., v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980). While we sustain Porter and Q.A.'s second issue, we need not

reverse the entire judgment. The judgment did not expressly tie the damage award against Q.A. to a specific negligence finding. Therefore, we overrule Porter and Q.A.'s fifth issue.

### Porter and Q.A.'s Issue Six and Landry's Issues One and Two

In their sixth issue, Porter and Q.A. argue that the evidence is legally and factually insufficient to support the damages as remitted. They specifically challenge the damages awarded for Philip and Charlotte's past and future physical pain and mental anguish, Charlote's future physical and mental impairment, and Philip's future physical impairment.

Landry does not dispute that his negligence proximately caused the collision with the Curries. He further does not dispute that Philip and Charlotte suffered damages proximately caused by his negligence. He only disputes the amount of some of the damages awarded. In his first issue, Landry argues that the evidence is legally and factually insufficient to support the noneconomic damages awarded in the judgment. In the second issue, he contends that because the evidence is insufficient to support the noneconomic damages, the jury's exemplary damages award should be reversed.

## Standard of Review and Applicable Law

"Noneconomic damages" are damages awarded:

for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001 (12).

An excessive damages complaint is a challenge to the factual sufficiency of the evidence supporting the damages award. *See Anderson v. Durant*, 550 S.W.3d 605, 620 & n.66 (Tex. 2018); *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998); *Team Industrial Servs, Inc., v. Most*, 711 S.W.3d 31, 57 (Tex. App.—Houston [1st Dist.] 2024, no pet.). When a party attacks the factual sufficiency of an adverse finding on an issue on which it did not the burden of proof at trial, it must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Team Industrial*, 711 S.W.3d at 57.

A jury has great discretion in awarding damages, and we give deference to the jury findings on damages. *See Herchman v. Lee*, No. 02-22-00217-CV, 2024 WL 4898787, at *7 (Tex. App.—Fort Worth Nov. 27, 2024, pet. den'd) (mem. op). "Assigning a dollar value to non-financial, emotional injuries such as mental anguish ... will never be a matter of mathematical precision," and we review an award for noneconomic damages with this firmly in mind. *Id.*

(quoting *Gregory v. Chohan*, 670 S.W.3d 546, 550 (Tex. 2023)) (plurality op).

Although the amount of a noneconomic damages award is "uniquely within the factfinder's discretion," the award must still "fairly and reasonably compensate" for the plaintiff's injury based on the evidence presented. *Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017); *Golden Eagle Archery*, 116 S.W.3d at 772–73; *Herchman*, 2024 WL 4898787, at *7. We must reverse the jury's award if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Golden Eagle Archery*, 116 S.W.3d at 772–73. *Herchman*, 2024 WL 4898787, at *7.

In *Gregory*, a plurality of the Court proposed a new standard for reviewing noneconomic damage awards requiring a "rational connection, grounded in the evidence, between the injuries suffered and the dollar amount awarded." *Herchman*, 2024 WL 4898787, at *7 n. 8 (quoting *Gregory,* 670 S.W.3d at 550-51). Because it is a plurality opinion, the proposed standard is not binding precedent. *See Gregory,* 670 S.W.3d at 549. Although *Gregory* is a nonbinding plurality opinion, the justices all agreed that, when deciding on the amount of damages to award, the jury should consider the nature, duration, and severity of the claimant's loss. *Garza v. Escamilla*, 712 S.W.3d 718, 727 (Tex. App.—Houston [14th Dist.] 2025, no pet.) (citing *Gregory*, 670 S.W.3d at 557, 570–71). They agreed that the amount decided should not be

based on mere passion or prejudice or improper motivations. *Garza*, 712 S.W.3d at 727. *Id.* at 564 n.16, 570, 576.

**Discussion**

In relevant part, Question 4 asked the jury what sum of money would fairly and reasonably compensate Philip for his injuries that resulted from the occurrence in question as follows:

> 1. Physical pain and mental anguish sustained in the past.
>    ANSWER: 1,062,720.00
>
> 2. Physical pain and mental anguish that, in reasonable probability, Philip Currie will sustain in the future.
>    ANSWER: 1,555,200.00
>
> 3. Physical impairment sustained in the past.
>    ANSWER: 100,000.00
>
> 4. Physical impairment that, in reasonable probability, Philip Currie will sustain in the future.
>    ANSWER: 585,365.00
>
> 5. Disfigurement sustained in the past.
>    ANSWER: 50,000.00
>
> 6. Disfigurement that, in reasonable probability, Philip Currie will sustain in the future.
>    ANSWER: 50,000.00

In relevant part, Question 5 asked the jury what sum of money would fairly and reasonably compensate Charlotte for her injuries that resulted from the occurrence in question as follows:

> 1. Physical pain and mental anguish sustained in the past.
>    ANSWER: 2,656,800.00

2. Physical pain and mental anguish that, in reasonable probability, Charlotte Currie will sustain in the future.
 ANSWER: 27,993,600.00

3. Physical impairment sustained in the past.
 ANSWER: 200,000.00

4. Physical impairment that, in reasonable probability, Charlotte Currie will sustain in the future.
 ANSWER: 1,756,097.00

5. Disfigurement sustained in the past.
 ANSWER: 150,000.00

6. Disfigurement that, in reasonable probability, Charlotte Currie will sustain in the future.
 ANSWER: 250,000.00

The trial court's suggestion of remittitur did not reduce the noneconomic damages as to Philip. The trial suggested remittitur on the noneconomic damages for Charlotte as follows:

Physical pain and mental anguish in the past.
 Suggested remittitur: 1,582,800.00

Physical pain and mental anguish in the future.
 Suggested remittitur: 23,697,600.00

Physical and mental impairment in the past.
 Suggested remittitur: 0

Physical and mental impairment in the future.
 Suggested remittitur: 0

Disfigurement in the past.
 Suggested remittitur: 25,000.00

Disfigurement in the future.

Suggested remittitur: 125,000.00

Charlotte accepted the trial court's suggestion of remittitur.

Landry specifically argues in his first issue that even though Charlotte accepted the trial court's suggestion of remittitur, the remitted awards for her past and future pain and mental anguish, past and future physical impairment, and past and future disfigurement are not supported by the evidence. He further contends that the evidence does not support the jury's award of damages on Philip's past and future pain and mental anguish, past and future physical impairment, and past and future disfigurement.

**Pain and Mental Anguish**

The presence or absence of pain, either physical or mental, is an inherently subjective question that largely depend on the plaintiff's word and on the jury's credibility determinations. *Herchman*, 2024 WL 4898787, at *9. In addition to a plaintiff's testimony, evidence of a severe injury will support an inference that the plaintiff experienced pain and suffering. *Id.* (citing *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 552 (Tex. App.—Fort Worth 2006 pet. denied)).

Mental anguish is compensable only if it causes a "substantial disruption in daily routine or a high degree of mental pain and distress." *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013) (internal quotation marks omitted). This requires evidence of the nature, duration, and severity of the mental

anguish, demonstrating a substantial disruption to the plaintiff's daily routine." *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 544 (Tex. 2018); *Team Indus. Servs., Inc. v. Most*, 711 S.W.3d 31, 58 (Tex. App.—Houston [1st Dist.] 2024, no pet.).

Both Porter and Q.A. and Landry challenge the awards to Charlotte for past and future physical pain and mental anguish. Charlotte suffered multiple injuries as a result of the collision including an aortic rupture, a significant abdominal injury, and rib fractures. She was in a medically induced coma for approximately one month. She testified at trial that when she was awakened from the coma, she experienced pain all over her body. She went to a rehabilitation hospital to learn basic skills. When she was released, she went to live with her daughter because she could not care for herself. She continued to live with her daughter at the time of trial with no immediate plans to return to her home with Philip because she needs assistance in caring for herself.

Charlotte described that she experiences constant headaches at least five days out of the week and that she also has persistent backaches. She has no feeling in her abdomen, and she has numbness in her fingers and toes. She stated that she cannot stand for a long time and that it hurts to walk. Charlotte had trouble sleeping after the collision and had nightmares of Philip screaming. Charlotte also testified that she suffers from anxiety after the

collision and that she can no longer interact with her grandchildren as she did before the collision.

There was evidence that Charlotte would require more surgeries in the future on her knee, back, and abdomen. There was also evidence that her memory loss, headaches, and dizziness would be chronic conditions. The jury heard testimony that Charlotte walks with an abnormal gait and that would also be a chronic condition.

While the awards were significant, they reflected the combined sums for two types of damages—physical pain and mental anguish—both of which were "almost entirely subjective," making the jury's role in assessing such damages "paramount." *See Herchman*, 2024 WL 4898787, at *10. Based upon the evidence, we conclude that the awards were within the range of the jury's broad discretion. *See Id*.

We will next consider the jury's award for Philip's past and future pain and mental anguish. Philip suffered a severe fracture of his arm that caused the bone to go into his shoulder. He described that immediately after the collision, his arm felt like it was on fire. As a result of the fracture, Philip developed a blood clot in the major artery supplying blood to the arm. Philip required immediate surgery to save his arm. Because of his trauma and injuries, Philip had a stroke that resulted in a loss of his peripheral vision. Philip also had rib fractures and a severe laceration to his tongue.

Philip stated that for over a year, he had to sleep in a recliner because of his arm injury. He described that his arm feels like it is "asleep" and that from his elbow to his wrist, it feels like his arm is in a "vice and it's squeezing." He said that feeling was still present at the time of trial. He testified that he experiences pain almost every day.

When he was released from the hospital, Philip went to live with his sister because he could not care for himself. He eventually moved back into his home, but his brother moved in with him to help with his care. Philip suffered from depression after the collision. He was unable to return to work after the collision, and he cannot perform routine tasks at his home.

Philip testified to the extreme pain he suffered at the time of the collision, and the ongoing pain he experiences daily. He described a "substantial disruption in daily routine or a high degree of mental pain and distress." *See Hancock,* 400 S.W.3d. at 68 (internal quotation marks omitted). Based upon the evidence, we conclude that the awards for past and future physical pain and mental anguish were within the range of the jury's broad discretion. *See Herchman,* 2024 WL 4898787, at *10.

**Physical Impairment**

Physical impairment damages compensate a plaintiff for the loss of the injured party's former lifestyle to the extent that such injuries are distinct from, or extend beyond, injuries compensable through other damage elements.

*See Herchman*, 2024 WL 4898787, at *10. Physical impairment extends beyond loss of earning capacity and beyond any pain and suffering, to the extent that it produces a separate loss that is substantial or extremely disabling. *Dawson v. Briggs*, 107 S.W.3d 739, 752 (Tex. App.—Fort Worth 2023, no pet.).

Landry does not challenge the existence of Charlotte and Philip's physical and mental impairment, but rather the amount of those damage awards. Porter and Q.A. challenge Charlotte's award for future physical and mental impairment. As previously stated, a jury has great discretion in awarding damages, and we give deference to the jury findings on damages. *See Herchman*, 2024 WL 4898787, at *10. The trial court did not suggest any remittitur on the jury's award to Charlotte for past and future physical and mental impairment.

We will first address Charlotte's past and future physical impairment. After being released from the rehabilitation facility, Charlotte could not care for herself. She needed assistance to use the restroom as well as in other aspects of her personal hygiene care. Charlotte described that she no longer has the ability to feel when she needs to use the restroom, so she wears diapers and routinely goes to the restroom every two hours. According to her daughter, Charlotte is unable to cook, clean, do laundry, or go to the grocery store to care for herself. Charlotte needs daily reminders to perform personal grooming and

hygiene. There was credible evidence of Charlotte's loss of her former lifestyle distinct from those of physical pain and mental anguish. *See Herchman*, 2024 WL 4898787, at \*11. Therefore, we cannot say that the awards were manifestly unjust or unreasonably compensated her for the permanent changes to her lifestyle. *See id.*

Philip suffered permanent damage to his arm. The Currie's expert agreed that Philip will "see a significant amount of impairment moving forward." In addition, Philip has permanent vision loss, and he was not able to return to his previous job. Philip's brother lives with him to assist in caring for Philip and in household tasks. Philip's brother testified that Philip will not be able to live independently. Philip no longer lives with Charlotte, and he testified that is not able to have sexual relations. There was credible evidence of Philip's loss of his former lifestyle distinct from those of physical pain and mental anguish. *See id.* Therefore, we cannot say that the awards were manifestly unjust or unreasonably compensated him for the permanent changes to his lifestyle. *See id.*

**Physical Disfigurement**

Landry does not dispute the existence of Charlotte and Philip's disfigurement but rather challenges the amount of damages awarded. Porter and Q.A. challenge Philip's award for future physical disfigurement. Disfigurement means that which impairs or injures the beauty, symmetry, or

appearance of a person or which renders a person unsightly, misshapen, or imperfect, or deforms in some manner. *Goldman v. Torres*, 161 Tex. 437, 341 S.W.2d 154, 160 (Tex. 1960). Surgical scarring falls into that category. *See Gonzales as Next Friend of Gonzales v. 3 Atoms, LLC*, No. 07-19-00437-CV, 2020 WL 1966290, at *3 (Tex. App.—Amarillo Apr. 23, 2020, no pet.) (mem. op.). Furthermore, additional scarring or deforming is not required to recover damages for future disfigurement, although it may be a factor in determining the extent of the damages. *See id.* Other indicia relevant to the inquiry is embarrassment and shame arising from the scars. *See id.* The award depends on the circumstances of each case and there is no mathematical yardstick exists by which one can measure damages for it. *See id.*

As a result of her injuries, Charlotte required a tracheostomy to breathe. That procedure left a large, permanent scar on her neck. In addition, she has scarring on her abdomen from her required surgeries. Her daughter testified that Charlotte is uncomfortable with her scars and feels that her appearance is "gross" because of it. Based upon the evidence before us and given that there is no mathematical yardstick by which to measure disfigurement awards, we cannot say that the awards to Charlotte for past and future disfigurement were manifestly unjust. *See Herchman*, 2024 WL 4898787, at *8.

Philip's surgery on his arm required an eight-inch cut that left a significant scar. He explained that the scar is painful and continues to bother

him. The jury viewed a photograph of Philip's permanent scarring on his arm. Again, based upon the evidence before us and given that there is no mathematical yardstick by which to measure disfigurement awards, we cannot say that the awards to Philip for past and future disfigurement were manifestly unjust. *See Herchman*, 2024 WL 4898787, at *8.

Having reviewed all of Porter and Q.A.'s and Landry's complaints on the award of noneconomic damages awarded to Charlotte and Philip, we conclude that the evidence is factually sufficient to support the noneconomic damages awarded in the judgment. Accordingly, we overrule Porter and Q.A.'s sixth issue and Landry's first issue.

**Exemplary Damages**

Landry contends that because the evidence is insufficient to support the noneconomic damages, the jury's exemplary damages award should be reversed. Landry argues that because "the overwhelming majority of compensatory damages awarded to the Curries were for non-economic damages supported by insufficient evidence,[] the award of $806,400 in exemplary damages should also be reversed and remanded for determination in a new trial." We note that here the trial court's judgment awarded the Curries $10,979,382 in non-economic damages and awarded $3,562,458 in economic damages. Because of our disposition of Landry's first issue, we overrule Landry's second issue.

## This Court's Ruling

We affirm the trial court's judgment on the Curries' claims against Porter. Having sustained Porter and Q.A.'s second issue, we modify the judgment to delete Q.A.'s proportionate responsibility of 50%. Because we conclude that the jury's finding on respondeat superior is supported by the evidence, Q.A. is vicariously liable for Landry's negligence. Therefore, Q.A. is liable for 30% of the damages awarded, and we modify the judgment to that effect. Having overruled Landry's first issue, we affirm the trial court's judgment on the Curries' claims against him. We affirm the judgment as modified.

_____

MATT JOHNSON
Chief Justice

OPINION DELIVERED and FILED: January 29, 2026

Before Chief Justice Johnson,
     Justice Smith, and
     Senior Justice Davis[2]
Modified and affirmed; motion granted
CV06



---

[2] The Honorable Rex Davis, Senior Justice (Retired) of the Tenth Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Texas.